[No. E038381. Fourth Dist., Div. Two. Apr. 24, 2007.]

In re BRIAN J., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
BRIAN J., Defendant and Appellant.

COUNSEL

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson and Gary W. Schons, Assistant Attorneys General, Gil Gonzalez and Garrett Beaumont, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**HOLLENHORST, Acting P. J.—**

## I. INTRODUCTION

Defendant Brian J. appeals from the two-year extension of his commitment to the California Youth Authority (CYA)[1] under Welfare and Institutions

---

[1] Effective July 1, 2005, the CYA is now called the Department of Corrections and Rehabilitation, Division of Juvenile Facilities. (Welf. & Inst. Code, §§ 1703, subd. (c), 1710,

Code[2] section 1800 et seq., the juvenile extended detention act (EDA). First, he contends the EDA deprived him of equal protection of the law by treating him differently from similarly situated adult prisoners who are subject to civil commitments under the Sexually Violent Predators Act (SVPA) (§ 6600 et seq.) and the mentally disordered offender (MDO) laws (Pen. Code, § 2960 et seq.). Second, he contends the order extending his commitment is unconstitutional because it is penal in nature, violates substantive due process, and results in cruel and unusual punishment. Third, he contends there is insufficient evidence that his mental disorder causes him serious difficulty in controlling his dangerous behavior or that any risk of reoffense is a result of a mental disorder. Finally, he contends the order must be reversed because of prejudicial misconduct of the prosecutor in argument to the jury. We find that any errors were nonprejudicial, and we affirm.

## II. FACTS AND PROCEDURAL BACKGROUND

### A. *Original Commitment*

Defendant's original commitment to the CYA began on March 13, 1997, when he was 14 years old. In the commitment offense, he lured the eight-year-old victim into a motor home by offering to show him some magazines. Defendant pushed the victim down, bound his hands and feet together, took his clothes off, and put duct tape across his eyes and mouth. Defendant pressed a knife against the victim's back and threatened to cut him if he did not "shut up." Holding the victim down, defendant put his penis in the victim's mouth and urinated. He whipped the victim with a belt and a piece of wood and punched him twice in the stomach. The victim begged him to stop, and eventually defendant cut him loose and let him leave. Defendant had himself been molested in similar fashion by an uncle from ages five through 13.

### B. *Section 1800 Petition*

On December 10, 2004, the Riverside County District Attorney filed a petition under section 1800 to extend defendant's CYA commitment, which was to expire on January 31, 2005. The petition was based on a letter from the Youthful Offender Parole Board and on defendant's CYA master file, both of which were attached to the petition. The trial court conducted a hearing and found probable cause to believe defendant was "likely to be physically dangerous to the public due to his mental or physical deficiency, disorder or abnormality."

---

subd. (a).) For the sake of clarity and consistency with the designation used by the trial court, we will refer to that entity as the CYA in this opinion.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

### C. *Evidence at Defendant's Jury Trial*

From April 1997 through March 1999, defendant was assigned to the caseload of youth correctional counselor (YCC) Katherine Harris of the Marshall unit at the CYA reception center in Norwalk. The Marshall unit has an intensive treatment program for wards with psychological problems. While there, defendant participated in groups and counseling sessions for trauma recovery, anger management, sex offenders, and victim awareness.

Harris prepared a report about defendant's first year in CYA, in which she described his behavior as "out of control." Defendant made rude comments to his peers, wrote them sexual letters or notes, touched their genitals without their permission, and threatened to fight them. He was diagnosed as being a serious pedophile. Harris testified that defendant was found in possession of pornographic photographs of children, and he admitted masturbating to the photographs. Staff had reported that defendant had yelled obscenities at visiting children through the visitors' window while masturbating, so he had to be moved to another side of the unit where he could not see the children.

The second annual report noted that defendant was acting out sexually by touching other wards inappropriately and writing an inappropriate sexual letter. Harris described his behavior during his second year at CYA as "[v]iolent, out of control, highly sexual, acting out and really kind of dangerous. . . . [A]lways having to watch him." During group sessions, defendant was an agitator, and he laughed when other wards talked about their victims. Harris testified that defendant had the ability "[t]o some degree" to control his behavior if he wanted to. Defendant showed some improvement when he applied himself. For a month or two, defendant did control his behavior sufficiently that he was moved to a higher phase and received more privileges, but he "had difficulty controlling his behavior," and he regressed.

Harris testified that normally, wards had a single counselor assigned to them, but defendant was assigned two counselors and a therapist because of his severe behavioral issues. Defendant met with his counselor at least one hour per week and with his therapist twice a week. He also had recovery group, trauma group, and victim group sessions once each per week. His progress was poor because he was resistant to treatment and disruptive during his group sessions. He did not openly discuss his commitment offense, and he showed no empathy for his victim.

From March through December 1999, defendant was in a specialized counseling program for sex offenders at Oak Lodge. Dr. Peter Shumsky, a clinical psychologist for the CYA, conducted a psychological evaluation of defendant, who was being considered for a transfer because he had been in

the program for nine months but had not made any progress. Dr. Shumsky reviewed prior evaluations and defendant's file and interviewed defendant. In addition, defendant had attended Dr. Shumsky's group sessions for four hours per week for several months.

Dr. Shumsky noted that defendant had poor impulse control and acted out with physical and verbal aggression. He continued to present "an extremely elevated danger towards young children of both sexes." Defendant masturbated daily to sexual fantasies of children, and he had developed a sexually deviant arousal problem with a primary orientation toward children. Defendant had poor social skills, and he was uncomfortable with and fearful of adult men because of his history of abuse. Dr. Shumsky diagnosed defendant with attention deficit hyperactivity disorder (ADHD), predominantly hyperactive impulsive type; conduct disorder, childhood onset type, moderately severe; pedophilia, nonexclusive type; and sexual abuse of a child. Dr. Shumsky stated his opinion that defendant's addiction to masturbating to images of children "would cause serious difficulty in controlling [his] behavior."

A transfer summary dated December 22, 1999, prepared by YCC Janice Carter, stated that defendant had no empathy for his victim, and he continued to change his story about what he had actually done to the victim. Defendant admitted having continuing sexual fantasies about young boys and admitted that for at least a year, he had masturbated twice daily to those fantasies.

In 2000, defendant was assigned to the caseload of YCC Tom Casillas at O.H. Close Youth Correctional Facility (Close) in Stockton. Casillas prepared an annual review and transfer summary for defendant in January 2001. Defendant's treatment team felt defendant needed to be transferred because he was not meeting his goals or treatment needs. In group sessions, defendant never showed any empathy toward his victim or remorse for his offense. His performance in the sex offender group was poor because of lack of participation. Defendant and another ward were reported to have engaged in sexual activity in a classroom, although defendant denied doing so. Defendant told Casillas that he had planned his committing offense for about two months.

In March 2001, defendant was assigned to a specialized counseling program for emotionally disturbed wards at N.A. Chaderjian Youth Correctional Facility (Chaderjian); the majority of wards in the program are sex offenders. Defendant was first assigned to the caseload of YCC Esiquio Chico Gutierrez at Chaderjian. Gutierrez prepared an annual review dated April 15, 2002, which indicated defendant was not accepting full responsibility for his offense and did not want to discuss treatment issues related to his offense. Defendant got into verbal conflicts with other wards, "disrespected" other wards, and came

close to getting into physical altercations with them. He sometimes was disruptive by "[s]houting profanities. And then just shouting, being angry, standing up, shouting you know" towards other wards and Gutierrez. He "[r]eacted very quickly without even thinking of the consequences." Defendant's progress in group was mediocre because he would get upset and frustrated and would refuse to talk, and he failed to complete his homework assignments. Between April 2001 and April 2002, defendant participated in "rational behavior therapy, anger management, parenting, victim awareness, [and] self-esteem . . . [along with] assertion group, process, individual counseling, small group counseling, sex offender counseling."

Defendant was assigned to the caseload of YCC Martin Jimenez from 2002 through July 2003 in the specialized counseling program at Chaderjian. In March 2003, Jimenez prepared an annual review/transfer report stating that defendant did not express any empathy for the victim or remorse for what he had done to the victim. His progress in the program had been minimal. He still engaged in inappropriate behavior in his living unit. Jimenez described an incident in which, in May 2002, a cook noticed defendant in the dining room with an art class. Defendant spoke to the cook in the kitchen. A few minutes later, defendant went to the cook's office and engaged in small talk, then tried to close the door. The cook yelled at him to open the door. Defendant did so and walked out. The look in his eyes made the cook fearful. Other wards had reported that defendant had stared at the cook in the dining hall for a long period of time. Defendant admitted to Jimenez that he had planned to rape the cook. On another occasion, defendant masturbated another ward in the recreation yard.

Jimenez prepared chronological notes in early 2003 concerning defendant. The notes indicated defendant continued to lack progress in his treatment, and he still posed a danger to the public. Defendant had sadistic fantasies and urges, and he stated he got pleasure from beating other people. He admitted fantasizing about his commitment offense. Jimenez prepared a transfer summary in May 2003. Defendant had been in the counseling program at Chaderjian for almost two years, but had not made any significant progress, and his treatment team felt that a new environment might give him a new start. At a case conference in May 2003 with his treatment team, defendant yelled profanities, refused to sit down, and had to be removed to his room where he continued yelling. In another incident, defendant tried to make a hole in the wall of his room so he could commit a sexual act with the ward in the adjacent room.

Dr. Sophia Johnson was a staff psychologist at Chaderjian. Defendant participated in a sex offender group treatment program that she led in 2002; the group met weekly for two to two and one-half hours. Defendant was

usually quiet in group and did not participate much. In November 2002, Dr. Johnson wrote a behavior report on defendant after he walked out of the group when she confronted him and told him he needed to talk about his offense. During the discussion, she told defendant he risked a section 1800 petition unless he participated in treatment. Dr. Johnson recommended that defendant be tracked for section 1800 proceedings because "he hadn't ventured into treatment or he was not motivated," because of "his level of aggression and anger and inability to control it," and because of "his ongoing sexual acting out during his incarceration." When Dr. Johnson wrote the report, she believed defendant was a danger to the community. She recommended defendant be transferred to another sex offender program to allow him a new start.

In Dr. Johnson's opinion, defendant demonstrated progress when he told Jimenez in January 2003, that he was still a danger to the public. She believed defendant's honesty with his counselor about his fantasies regarding the commitment offense was also a step in the right direction.

During a group session in February 2003, defendant admitted sexually assaulting other children in the same manner as his commitment offense. In Dr. Johnson's opinion, defendant was dangerously sadistic and fascinated with hurting others.

On April 1, 2003, Dr. Johnson prepared a note stating that defendant was able to talk about his commitment offense, but he did not know what his motivations had been, and he could not express his feelings about what he had done. Dr. Johnson described defendant as having a fragile ego defended by anger and sadistic rage.

Defendant was transferred to Heman G. Stark Training School (Stark) in Chino in August 2003, where he was assigned to the caseload of YCC Osei Yaw. Defendant attended a weekly impulse control group, during which he showed difficulty sitting still and taking orders from staff. Defendant exhibited similar behavior and failed to participate in his sex offender group.

In Yaw's view, defendant is still a danger because he is attracted to children, and "he has very little impulse control in his urges." Defendant admitted stalking other wards and fantasizing about having sex with them. He had very little control when he became angry and he disrespected and used racial slurs against other wards, which put his life in danger. Although defendant had been taught intervention tools, Yaw saw no evidence that he ever used them.

Defendant admitted to Yaw that he had molested three victims, and he admitted that he had intended to rape the cook in the incident at Chaderjian.

He admitted he enjoyed tying up his victims. Defendant stated he believes he is a pedophile. He stated that he could be triggered into again molesting children by being in the company of children, using pornography, and having deviant sexual fantasies. He was still sexually acting out in his living unit, was writing inappropriate notes, and was stalking a couple of the other wards. Defendant admitted he had planned the commitment offense for months and had lured the victim into his father's motor home.

Defendant wrote out casework assignments in which he stated that before his offense, he had sexual fantasies and was looking for someone with a small penis and buttocks. He fantasized about having the victims orally copulate him while he was hitting them. Some of his fantasies included spanking. He wrote about his offense, but he was never able to discuss it in therapy.

Dr. Laura Poncin, a psychologist, was part of defendant's treatment team at Stark in 2003 and 2004, and defendant attended her weekly therapy group for child molesters for about eight months. Defendant admitted he was a sexual sadist and had had an erection when he was beating the victim. He admitted molesting other victims. He admitted he had "wasted seven years of his treatment." In Dr. Poncin's opinion, defendant's admission that he was a sadist was "a huge step" in his treatment. In the beginning stages of treatment with Dr. Poncin, defendant "seemed like he was going to be able to apply himself," but he then started going downhill by refusing to attend group sessions, getting into a fight with another ward, and being verbally disrespectful of other wards. He was transferred to another facility in April or May 2004 because there was concern his safety might be in jeopardy from other wards who were angry with him.

Dr. Poncin stated that defendant was able to control himself while in her group and at times in his living unit, although at other times he was not in control of himself. That behavior told her "he had the actual capacity to control himself if he chose to." She further testified that she saw a distinction between the ability to control behavior in a structured environment or institution and the ability to do so unsupervised in the community. She testified that defendant's mental disorder did not render him incapable of controlling his behavior.

David Michael Rhoades was a CYA correctional counselor assigned to the sex offender program at Stark in Chino. Defendant was in Rhoades's sex offender group for three or four months and in Rhoades's resource recovery group for about two months in 2004. Defendant's participation in the sex offender group had been "minimal at best," and he spoke only when confronted directly. He expressed a lot of anger about his own victimization. In the recovery group, defendant indicated that he had enjoyed his offense

toward his victim, and he did not want to change anything about himself. Because defendant did not want to deal with his issues, Rhoades removed him from the group. Rhoades never witnessed a time when defendant lost control.

Casework specialist Michael Farmer was part of defendant's treatment team at Stark from summer 2003 to summer 2004. He conducted case conferences every other month with defendant, Dr. Poncin, and Yaw to discuss defendant's progress in the program. Defendant's participation in group sessions had been inconsistent and limited, and he made minimal progress in dealing with the issues regarding his sexual offense. He did not have good interaction with his peers and often got into conflicts with them by making racial or other comments to them. A specific relapse prevention program was never discussed with defendant because he never demonstrated enough consistent knowledge of the assault cycle to work on such a plan.

Farmer compiled a section 1800 report on defendant in May 2004. The report included defendant's annual reviews, his treatment history, and his confinement history. All the annual reviews from 1998 through 2004 stated defendant was not participating in groups or really addressing the significance of the commitment offense. However, during confinement, defendant's inappropriate behaviors had slowed down.

Defendant was returned to Chaderjian in 2004. Although he was no longer assigned to Gutierrez's caseload, Gutierrez observed that after his return, defendant seemed more mature and better able to manage himself, but in July or August 2004, defendant relapsed, in that he twice exposed himself to a female supervisor. Jimenez also observed that after defendant's return to Chaderjian, defendant had made progress in his ability to handle frustrations and control his impulses.

Dr. Johnson reported that during defendant's first placement at Chaderjian, he "did literally almost nothing," but the second time, after his return in 2004, "he did talk about his victims and he did go over his offense and he did begin his assault cycle." Defendant discussed the facts of his offense, although he still did not show empathy or remorse toward the victim. He had matured over time, and "[he] was able to control himself and refrain from acting out as often, as frequently or as violently. He was doing a lot better the second time in that area as well." However, Dr. Johnson did not see defendant using the techniques he was being taught, because defendant continued to act out in the hall, although not in group. Although defendant was not an active participant in group, his participation was improved.

Dr. Johnson testified she believed defendant suffers from a mental disorder, but she did not believe that mental disorder causes him serious difficulty in

controlling his behavior. Rather, she testified, "He's well planned." She explained, "He has a disorder. There's no doubt. He has several diagnos[e]s. But those do not create—they do not impact his volitional behavior at all. He's able to plan his offenses. He—he actually—even on the . . . writeups at CYA, all the behavior reports that I've seen as far as his masturbating have been planned out ahead of time. The incident with the cook seemed to be relatively planned. And there's incidences throughout this report that talk about how well planned he is. He planned his commitment offense as well. But I'm not disputing that he has the diagnos[e]s. I'm just saying that they do not impact his ability to plan. As a matter of fact, he's well planned." She further explained that even an addict has "the capacity to refrain . . . unless you have mental retardation or something where you aren't capable."

Dr. Johnson was asked if she believed an addiction would cause a person to have serious difficulty in refraining from behavior, and she stated she did not believe so. She explained, "It's programming. It's actually again relapse prevention. It's knowing your high risks, embracing treatment and high risks and intervention. Not willpower at all. It doesn't work." She stated that for an addicted person to stop, interventions would be required, and if such interventions were not in place, it would be more difficult, although not impossible. When asked if one who suffers from a mental disorder that causes serious difficulty in controlling behavior could still control that behavior, she responded, "One could—yes and no. I mean if it's really—if you're out of control and your mental illness affects you, then truly if it affects you and you can't control your behavior, you would act out. . . . Either you lack control because of it, 'I'm psychotic, and I can't stop talking to myself,' or, you know, 'I'm something else. And I am able to control it.' Somebody who is psychotic wouldn't be able to."

Dr. Inga Talbert, a clinical psychologist with CYA, conducted the section 1800 psychological evaluation of defendant. Dr. Talbert had never participated in defendant's treatment. In conducting the evaluation, she reviewed all his files and interviewed him over three days in April 2004. She testified that during the interviews, defendant was easily distracted. When she asked him about his commitment offense, he said he did not want to talk about it, and he told her to read his file. He stated he had molested five child victims of both sexes starting when he was 13 years old. He stated, "I'm a sexual sadist. I'm sexually aroused by pain that I inflict on my victims." Defendant was detached and unemotional when discussing his victims, but he stated he had remorse for what he had done.

Defendant had been prescribed Wellbutrin and Depakote because of his ADHD. Defendant told Dr. Talbert he used to masturbate when he was bored, but he no longer did so. He had had surgery to remove a cyst on his testicle,

and he claimed his tubes had been tied so nothing came out when he masturbated. He described himself as being quiet in school. He denied getting into physical altercations or making verbal threats to other students. He said he had been suspended three to five times. He had graduated from high school while in CYA and had taken one college class.

Dr. Talbert tested defendant and found no indications of organic impairment. On the personality assessment inventory, his score on the violence potential index was one of the highest Dr. Talbert had seen, indicating defendant has a "greatly high risk of violent behavior." A violence risk appraisal based on defendant's file information showed a 55 percent probability of violent recidivism in seven years after release and a 64 percent probability in 10 years after release. A sex offender risk appraisal based on his file information showed a 58 percent probability of violent recidivism after seven years of release and a 76 percent probability after 10 years of release.

Dr. Talbert also gave defendant a multiphasic sex inventory. The results indicated that "he may have some problems controlling his sexual thoughts and impulses," and "he appeared to be actually obsessed with sex." On the motivation for treatment scale, he answered "False" to the statement, "Even without any treatment, I know that I can control my sexual behavior," and "True" to the statement, "I need help because I'm not able to control my sexual behavior." Overall, the test showed that defendant is interested in sex with children, and he has sexual urges, fantasies, and behaviors consistent with pedophilia and child molestation, and rape fantasies tied to sexual sadism. Defendant's overall profile on the test was "not even close" to meeting the criteria for one who has completed treatment for being a sex offender. On the Hare psychopathy checklist, defendant's score was in the psychopathic range, meaning he has "[a]n elevated risk of future violence and recidivism."

Dr. Talbert diagnosed defendant with (1) pedophilia, sexually attracted to both, nonexclusive type; (2) sexual sadism; (3) sexual masochism; (4) sexual disorder, not otherwise specified; (5) paraphilia, not otherwise specified; (6) ADHD, predominantly hyperactive impulsive type; (7) sexual abuse of a child; and (8) antisocial personality disorder. She also believed he should be diagnosed with exhibitionism, frotteurism, and posttraumatic stress disorder.

In Dr. Talbert's view, pedophilia is a lifelong problem, like an addiction, and people who are not treated have significant difficulty in controlling their behavior. Sexual sadism is a rare disorder, and defendant was very young when he committed his offense. Sexual sadists may control their behavior in a controlled setting, but have no incentive to stop when released to the

community unless they have been treated. Adults with ADHD are more likely to act out sexually than persons without the disorder, and ADHD can exacerbate other disorders, making it more difficult for one to control his or her behavior. Medication is not generally enough to control impulsive behaviors.

Dr. Talbert stated her opinion that based on the severity of the diagnoses and lack of treatment, defendant would not be able to control his behavior, and he is physically dangerous. She believed he could successfully be treated, and treatment options are available in CYA. She believed defendant has the capacity to control his behavior, but there was no evidence he had learned the proper coping tools and mechanisms to help him succeed in the community, and he therefore had an increased risk of being unable to control his behavior. Dr. Talbert based her opinion on defendant's history, his CYA writing assignments, her interview of defendant, and psychological tests.

In preparing her section 1800 evaluation, Dr. Talbert discussed defendant's treatment with Dr. Johnson. Dr. Johnson told Dr. Talbert that defendant was attentive in group and was making progress. He was learning concepts, but not applying them to his behavior. Dr. Johnson told Dr. Talbert that defendant was "a very dangerous ward and that he has not completed his treatment and that he doesn't really seem to be motivated to work on his issues." Dr. Johnson also reported that defendant "stalks female staff often and had acted out sexually with males while in CYA" and that "he still has a lot of work to do in his treatment before he would be ready for release."

In his defense, defendant presented the testimony of Richard Alvarado, a treatment team supervisor, who had investigated the incident involving the cook. After interviewing the cook, other witnesses, staff members, and defendant, Alvarado modified the original complaint from attempted assault on a staff member to a security violation for "being in an out-of-bounds area." However, Alvarado testified that the evidence presented to him had not included defendant's later admission that he had intended to rape the cook. If Alvarado had had that information, he would have sustained the original allegation.

Following trial, the jury found that defendant "is physically dangerous to the public because of his mental or physical deficiency, disorder, or abnormality which causes him to have serious difficulty controlling his dangerous behavior, and this inability to control his behavior results in a serious and well-founded risk that he will reoffend." The trial court ordered that defendant's CYA commitment be extended for not more than two years.

## III. DISCUSSION

In keeping with the principle that we do not reach constitutional issues if the case may be decided on another basis (see, e.g., *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 230 [45 Cal.Rptr.2d 207, 902 P.2d 225]), we will first consider defendant's challenge to the sufficiency of the evidence and his argument that the prosecutor committed prejudicial misconduct. We will then turn to defendant's various constitutional challenges to his extended detention.

### A. *Sufficiency of Evidence*

Defendant contends the evidence was insufficient to establish that his mental disorder causes him to have serious difficulty in controlling his behavior and that there was a resulting serious and well-founded risk he would reoffend.

#### 1. *Standard of Review*

When reviewing the sufficiency of the evidence in an EDA case, we view the record as a whole in the light most favorable to the judgment, drawing all inferences the trier of fact could reasonably have made to support the finding. (*In re Anthony C.* (2006) 138 Cal.App.4th 1493, 1503 [42 Cal.Rptr.3d 370] (*Anthony C.*).) In a case such as this, relying largely on expert testimony, experts must base their opinions on relevant, probative facts rather than conjecture (*id.* at pp. 1503–1504), but the jurors are not bound by any expert's opinion. In reaching their verdict, jurors must weigh the conflicting expert or lay opinions based on the qualifications and believability of each witness, the reasons for the opinion, and the matter upon which it is based. The jurors should give each expert opinion the weight they feel it deserves and may disregard any opinion they find unreasonable. (See, e.g., *People v. Smithey* (1999) 20 Cal.4th 936, 966 [86 Cal.Rptr.2d 243, 978 P.2d 1171].)

#### 2. *Analysis*

In *In re Howard N.* (2005) 35 Cal.4th 117 [24 Cal.Rptr.3d 866, 106 P.3d 305] (*Howard N.*), the California Supreme Court established stringent requirements for an extended detention consistent with the recent United States Supreme Court cases of *Kansas v. Crane* (2002) 534 U.S. 407 [151 L.Ed.2d 856, 122 S.Ct. 867] (*Crane*) and *Kansas v. Hendricks* (1997) 521 U.S. 346 [138 L.Ed.2d 501, 117 S.Ct. 2072], both of which addressed

Kansas's sexually violent predator (SVP) laws.[3] The *Howard N.* court held that for the extended detention scheme to be constitutional, it must be construed as requiring that the defendant's "mental deficiency, disorder, or abnormality *causes serious difficulty* in controlling behavior." (*Howard N.*, supra, 35 Cal.4th at p. 122; see *id.* at p. 136, italics added.)

However, as defendant concedes, a total lack of control is not necessary. (*Crane, supra,* 534 U.S. at p. 411; *Howard N., supra,* 35 Cal.4th at p. 129.) The Supreme Court in *Crane* stated: "It is enough to say that there must be proof of serious difficulty in controlling behavior. And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." (*Crane, supra,* 534 U.S. at p. 413.)

The *Howard N.* court explained, " '*Hendricks*[, *supra,* 521 U.S. 346] underscored the constitutional importance of distinguishing a dangerous sexual offender subject to civil commitment "from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." [Citation.] That distinction is necessary lest "civil commitment" become a "mechanism for retribution or general deterrence"— functions properly those of criminal law, not civil commitment. [Citations.] The presence of what the "psychiatric profession itself classified . . . as a serious mental disorder" helped to make that distinction in *Hendricks.* And a critical distinguishing feature of that "serious . . . disorder" there consisted of a special and serious lack of ability to control behavior. [¶] In recognizing that fact, we did not give to the phrase "lack of control" a particularly narrow or technical meaning. And we recognize that in cases where lack of control is at issue, "inability to control behavior" will not be demonstrable with mathematical precision. It is enough to say that there must be proof of serious difficulty in controlling behavior. . . .' [Citation.]" (*Howard N., supra,* 35 Cal.4th at p. 129.)

Thus, to extend an adult ward's CYA commitment beyond the date CYA jurisdiction would normally expire, there must be proof beyond a reasonable doubt that the person has a mental, physical, or psychological disorder that makes him physically dangerous to the public and that causes him serious difficulty in controlling his dangerous behavior. (§ 1801.5; *Howard N., supra,* 35 Cal.4th at pp. 134–135.) In *In re Michael H., supra,* 128 Cal.App.4th at

---

[3] It is settled that the "constitutional principles [of state and federal SVP cases] apply equally to all civil commitment schemes, including section 1800 . . . . [Citation.]" (*In re Michael H.* (2005) 128 Cal.App.4th 1074, 1089 [27 Cal.Rptr.3d 627].)

page 1091, the court held that an additional finding is required that the person's inability to control his behavior results in a serious and well-founded risk he will reoffend. Here, the jury was instructed that all these elements must be proved beyond a reasonable doubt, and the jury returned a verdict finding all the required elements.

Defendant contends, however, that the evidence is insufficient to prove that his "mental disorder causes him to have serious difficulty in controlling his behavior," and as a result, "there was no proof of the fourth element," a serious risk of reoffense.

However, defendant acknowledges that the expert testimony on the issue of whether his mental disorder causes him to have serious difficulty in controlling his behavior was conflicting. Dr. Talbert testified that pedophilia is a lifelong problem, and pedophiles are at high risk to continue their behavior if not treated. Sexual sadists may be able to control their behavior in highly controlled settings, but if released to the community without the necessary tools, they have no incentive to stop their behavior. Dr. Talbert stated her opinion that defendant is physically dangerous and will not be able to control his behavior. Dr. Talbert also performed a risk analysis that showed a well-founded risk defendant would reoffend, and she tied that risk to his diagnosed disorders.

Nonetheless, defendant argues that the evidence at trial did not meet the stringent criteria for extended detention as established in *Howard N., supra,* 35 Cal.4th 117. He relies primarily on the testimony of Dr. Johnson, who testified that defendant's disorder did not cause him serious difficulty in controlling his behavior but that instead, he planned his behavior. Dr. Johnson further testified that the *Howard N.* case had changed her opinion as to whether section 1800 proceedings were appropriate in defendant's case. She explained, "[This] case seems to have really changed the issues at hand. While somebody may appear to be dangerous and might be dangerous, the fact is my understanding of this case law requires the person to have a mental illness, for example, as [defendant] does, but the mental illness *must affect his volitional behavior and that would take more of like a psychotic disorder or it may be mental retardation. Something very severe to affect his behavior. That's my interpretation of the new case law.*" (Italics added.) She further explained that she believed the disorder "has to be of a nature *where he's not able to exercise free will.*" (Italics added.)

Defendant also notes that Dr. Talbert opined that although defendant is physically dangerous, he does have the capacity to control his behavior and has shown that he can control his behavior. YCC Gutierrez testified that after defendant's return to Chaderjian in 2004, defendant's behavior and maturity

had improved—he seemed better able to manage himself, and he no longer was engaging in verbal or aggressive behavior. Dr. Johnson also noted improvements in defendant's behavior and in his participation in therapy after his return to Chaderjian. Defendant's anger had subsided or was less apparent, he could subdue his anger more easily, and he did not have any behavior problems in group therapy. Dr. Poncin testified defendant had the capacity to control his behavior. Although she testified that every pedophile and sexual sadist bears a risk of having a serious difficulty of controlling his behavior, she concluded that defendant's mental disorders did not render him incapable of controlling his behavior.

In citing this evidence, defendant has merely pointed out conflicts in the evidence, and the jury resolved those conflicts against defendant. In fact, defendant's trial counsel acknowledged in argument to the jury that the experts' opinions were in conflict. Moreover, the evidence in this case is in sharp contrast to that in the one published case in which evidence was found insufficient to support an extended detention under the EDA.

In *Anthony C.*, the Court of Appeal held that the evidence was insufficient to support a finding beyond a reasonable doubt that the defendant had serious difficulty controlling his sexually deviant behavior. (*Anthony C., supra*, 138 Cal.App.4th at p. 1509.) In that case, the defendant had been in his teens when he confessed to a sex crime against a child and was committed to the custody of the CYA. Before CYA jurisdiction expired, a petition was filed to extend his commitment under the EDA. (138 Cal.App.4th at p. 1500.) At the ensuing trial, a CYA psychologist, Dr. Herskovic, testified that the defendant had pedophilia and ADHD and posed a moderate risk of reoffending; however, Dr. Herskovic acknowledged he had not conducted a formal risk assessment. (*Id.* at p. 1502.) The defendant's youth counselor stated that the defendant generally behaved well, but he needed close supervision and had difficulty telling the truth. (*Ibid.*)

The jury found the defendant to be dangerous, and the trial court extended his commitment for two years. (*Anthony C., supra*, 138 Cal.App.4th at p. 1502.) On appeal, the court noted that clear evidence showed that the defendant had a mental disorder, based on the diagnoses of pedophilia and ADHD, but the psychologist failed to testify about the extent or degree of the disorder, never discussed whether or not it could be cured, never characterized it as a repetitive compulsive disorder, and never prepared a formal risk assessment. (*Id.* at p. 1506.) Another expert had been requested to make such an assessment, but shortly before the hearing, he announced that he was unavailable to appear, and his conclusions or report were not introduced as evidence. Dr. Herskovic had seen the second expert's report, but could not recall many of the factors that expert had relied on and was uncertain as to

the degree of risk the defendant posed. (*Id.* at pp. 1506–1507.) Thus, the court concluded, Dr. Herskovic's testimony did not amount to substantial evidence that the defendant had serious difficulty controlling his behavior, and no evidence indicated that the defendant's mental problems caused him serious difficulty controlling sexually deviant behavior. (*Id.* at p. 1507.) In addition, Dr. Herskovic suggested that any impulsivity arising from the defendant's ADHD might be controlled with medication. (*Ibid.*) The defendant's behavior during confinement did not support a finding of current lack of control, because he had no history of acting on fantasies while committed, he understood he had a mental illness, he participated in the sex offender program, and he was serious about his treatment. (*Id.* at p. 1508.) The defendant's own statement that he believed he needed more treatment before he would feel comfortable about release from commitment did not necessarily prove he was dangerous, but could "just as easily be an indicator he is on the road to rehabilitation." (*Ibid.*)

Here, in contrast, Dr. Talbert did prepare a formal risk assessment. The violence risk appraisal based on defendant's file information showed a 55 percent probability of violent recidivism in seven years after release and a 64 percent probability in 10 years after release. The sex offender risk appraisal based on his file information showed a 58 percent probability of violent recidivism after seven years of release and a 76 percent probability after 10 years of release.

Moreover, unlike the defendant in *Anthony C., supra*, 138 Cal.App.4th 1493, defendant had an extensive history of acting on his fantasies while committed. This included keeping child pornography to help him masturbate, yelling obscenities at visiting children through the visitors' window while masturbating, making rude comments to his peers, touching their genitals, writing sexual letters, masturbating another ward, exposing himself to female staff members, and masturbating twice a day while having sexual fantasies about young boys. Although defendant showed some progress in treatment, he admitted masturbating another ward in a classroom in January 2002, and he exposed himself twice to a female supervisor in 2004. Dr. Johnson recommended defendant be tracked for a section 1800 report because of his lack of participation in sex offender treatment, his level of aggression and inability to control it, his ongoing sexual acting out, and the danger he posed to the community. Thus, Dr. Johnson's testimony at trial was contradictory to her own earlier written notes and incident reports.

Osei Yaw, defendant's youth counselor from September 2003 through April 2004 reported that defendant acknowledged he was a pedophile "not anywhere near recovery." Defendant stated that being around children, using pornography, and his own deviant fantasies could trigger him into molesting

children again. He still acted out sexually in his living unit, wrote inappropriate notes, and stalked other wards. He acknowledged having sexual fantasies about other wards while watching them from his room. Yaw opined defendant still posed a danger to children because he was sexually attracted to them, and he had very little impulse control over his urges. In tests conducted by Dr. Talbert, defendant admitted he could not control his sexual behavior without treatment and that he needed help because he was not able to control his sexual behavior.

In *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 921, footnote 12 [119 Cal.Rptr.2d 1, 44 P.3d 949], the court explained the distinction between the elements of a qualifying mental disorder that makes it seriously difficult to control violent sexual impulses and a likelihood of reoffense in the context of the SVPA. The court noted that an offender who does not have the required mental disorder may not be committed regardless of the risk of reoffense. (27 Cal.4th at p. 921, fn. 12.) The court continued, "[T]he SVPA requires both a qualifying mental disorder *and* a 'likel[ihood]' of reoffense, and the one does not predetermine the other. That one's mental disorder causes *serious difficulty* in controlling violent sexual impulses does not mean that such control is *impossible*. [Citation.] Many factors, including amenability to voluntary treatment . . . may influence the disordered offender's motivation, ability, means, and opportunity to function lawfully without supervision or restraint despite the impairment. The SVPA seeks to identify, confine, and treat only those volitionally impaired sex offenders whose chances of doing so are sufficiently low to present a serious, well-founded risk of reoffense." (*Ibid.*) We believe the same criteria should apply to EDA commitments.

We thus conclude the evidence amply supported the jury's findings that defendant's mental disorder causes him serious difficulty in controlling his dangerous behavior and that the risk of reoffense is a result of a mental disorder.

Moreover, we observe that although neither party objected on that basis, Dr. Johnson's testimony giving her interpretation of *Howard N., supra,* 35 Cal.4th 117, was a conclusion of law that was essentially irrelevant and inadmissible. (See 1 Witkin, Cal. Evidence (4th ed. 2000) Opinion Evidence, § 97, pp. 644–646 [as a general rule, expert testimony on legal conclusions is inadmissible]; see also *People v. Torres* (1995) 33 Cal.App.4th 37, 45–46 [39 Cal.Rptr.2d 103] [holding that expert testimony on the meaning of a statute was generally inadmissible and that instructing the jury on pertinent principles of the law was the duty of the trial court].) Dr. Johnson appears to have interpreted *Howard N.* as requiring that a defendant be unable to control his behavior as a prerequisite to extended

detention. As we have explained above, and as the jury was instructed, only a showing of serious difficulty in controlling behavior is required.

### B. *Prosecutorial Misconduct*

Defendant next contends the prosecutor committed reversible error by (1) appealing to the jurors' passions and prejudices by implying they could protect society with their verdict, and (2) interjecting his personal views into his argument by giving the jurors his own definition of addiction. In addition, defendant argues the prosecutor used first person pronouns when discussing the likelihood defendant would reoffend in the absence of further treatment, and posited a scenario in which defendant's victim could later use his victimization to defend himself against molestation charges, although there was no evidence that the victim had molested or was likely to molest another.

### 1. *Factual Background*

During argument, the prosecutor summarized some of the counselors' and therapists' assessments of defendant as follows: "After [defendant's] evaluation, he went back to [Chaderjian]. And while there were some bumps in the road there, Dr. Johnson, Mr. Gutierrez said you know what? I saw improvement of this guy. I saw maturity that hadn't been there before. I saw at least a willingness to engage in the treatment process that wasn't there before. [¶] Is he done? Dr. Johnson said no. He's got a lot of work to do. But she saw a maturity and a willingness on his part to try." The prosecutor then stated, "I think we can serve both interests here by finding true. We can protect our community and insure that there are no other victims out there."

Defense counsel objected, the court sustained the objection, and defense counsel moved for a mistrial. The court took the motion under submission.

The prosecutor then concluded argument as follows: "By a finding of true, we can help that those four elements that you're saying are true, that he has a mental disorder, that he's physically dangerous to the public, that he has a problem, significant difficulties controlling that and that he's likely to reoffend. We can try our best to make sure that doesn't happen. [¶] I'd ask that you find the Petition true."

During a recess, defense counsel argued in support of the motion for a mistrial that the prosecutor had committed prejudicial misconduct in appealing to "the jurors' passions, prejudices and fears by appealing to them to render a true finding in order to insure the safety of their community." The court found the prosecutor's argument to be "totally improper" and misconduct, and asked the prosecutor to address whether a mistrial should be granted.

The prosecutor argued that a curative instruction would be sufficient. Defense counsel disagreed, arguing that a mistrial was the only effective remedy: "I don't think a curative instruction is going to unring the bell. That was a damning appeal to their passions and to their fears." The trial court acknowledged that the prosecutor had interjected personal opinions into argument on multiple occasions. For example, the prosecutor had stated, "Is it possible he's not going to go out and reoffend without any further treatment? That's possible. I don't think it's likely. And I don't think that's what the testing supports." The prosecutor had also given his own definition of addiction: "What is an addiction? My understanding of an addiction is that you engage in behavior, you want to engage in behavior and you have a hard time not engaging in that behavior." The prosecutor had further argued that defendant's victim might someday victimize another and urged the jury to "try and break the cycle."[4]

After further argument on the motion, the trial court denied the motion for mistrial, but stated it would give a curative instruction. The trial court thereafter instructed the jury as follows: "You know, as I told you before, statements by the lawyers in argument are not evidence, but there's a couple [of] things I need to clarify. [¶] One, there's no evidence before you that [the victim] has molested anyone. And the second thing is your duty is not to insure the protection of society as was implied in the argument. Your duty is to determine whether the Petition is true beyond a reasonable doubt. And that's what you must focus on in rendering your decision."

### 2. Analysis

■ "[A] prosecutor commits misconduct by the use of deceptive or reprehensible methods to persuade either the court or the jury." (*People v. Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610], superseded by statute on other grounds as stated in *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1161–1165 [68 Cal.Rptr.2d 440].) Misconduct is judged by an objective standard, and the defendant is not required to show bad faith to obtain relief for misconduct. (*People v. Alvarez* (1996) 14 Cal.4th 155, 213 [58 Cal.Rptr.2d 385, 926 P.2d 365].)

---

[4] The prosecutor had argued: "And then eight-year-old [victim], that's another story that you guys don't know the ending to and you won't know the ending to because it's not an issue before you. But can you imagine a scenario where a person charged with child molestation comes before the court or the jury and says, 'I was a victim, too. So don't pay attention to what I did. Pay attention to what happened to me.' And, as a society, we simply cannot hold to that standard.

"We need to make attempts to try and break the cycle as best we can. There's no evidence that every person who was molested goes on to molest. But there's really strong evidence that says those who do go on to molest almost always were molested as a child in some form or fashion. It's rare that somebody was not exposed to this type of behavior but yet then goes out and engages in it. So I mean we need to do something to try and stop that."

Here, the trial court properly found that the prosecutor committed misconduct in his argument to the jury. The People impliedly concede that the prosecutor's argument constituted misconduct, a concession with which we must agree—the prosecutor implied the existence of facts not in evidence and interjected his personal views into the argument. (See *People v. Kirkes* (1952) 39 Cal.2d 719, 724 [249 P.2d 1] [improper to state facts not in evidence]; *People v. Bain* (1971) 5 Cal.3d 839, 848 [97 Cal.Rptr. 684, 489 P.2d 564] [improper to offer personal opinion].)

The People argue, however, that the trial court's admonition was sufficient to cure any prejudice. In determining the efficacy of an admonition in dispelling prejudice from improper argument, "we must weigh the cumulative effect of the improper statements that pervaded the prosecutor's closing argument." (*People v. Herring* (1993) 20 Cal.App.4th 1066, 1075 [25 Cal.Rptr.2d 213] [stating that a timely admonition would likely have cured harm from the prosecutor's improper statements maligning the defendant's character but that prejudicial error occurred when the prosecutor further implied that defense counsel had suborned perjury and "impliedly denigrated the presumption of innocence and the requirement that guilt be proved beyond a reasonable doubt"].)

In *People v. Price, supra,* 1 Cal.4th 324, the defendant complained on appeal that the prosecutor had vouched for the credibility of a prosecution witness by making the following argument: " 'God what a great witness. That's my opinion. If you don't feel that way, you think that [the witness] was a lying whatever, that's fine because you are now the judges.' " (*Id.* at p. 461.) The court stated that, assuming the remark was improper, "an admonition that the prosecutor's opinion was irrelevant would have avoided any possible prejudice." (*Id.* at p. 462.) Similarly, in *People v. Bell* (1989) 49 Cal.3d 502 [262 Cal.Rptr. 1, 778 P.2d 129], the prosecutor made "factually inaccurate" and improper remarks during argument that "were neither based on the evidence nor related to a matter of common knowledge." (*Id.* at p. 539.) The court held, however, that "[t]he impropriety was one that could have been offset by an instruction or admonition by the court," and the defendant therefore forfeited any claim of error by failing to object. (*Ibid.*)

Here, the trial court tailored its admonition to the prosecutor's specific remarks. The trial court first noted that there had been no evidence that defendant's victim had molested anyone. The trial court then emphasized that the jury's duty was to determine whether the petition was true beyond a reasonable doubt, not to ensure the protection of society. We conclude the trial court's admonition to the jury was sufficient to cure any prejudice from the prosecutor's misconduct.

## C. *Equal Protection*

Defendant contends his commitment under the EDA deprived him of equal protection because he was treated differently from similarly situated adult prisoners who are subject to civil commitments under the SVPA and the MDO laws. Specifically, he contends that under the EDA, he received lesser procedural protections, he was subject to broader commitment criteria, his conditions of confinement were more punitive, and there was no requirement that his mental disorder be treated.

### 1. *Overview of EDA*

■ The EDA allows the state to extend the detention of an adult ward beyond the date the CYA's jurisdiction would normally expire when the ward is determined, beyond a reasonable doubt, to be physically dangerous to the public because of his or her mental or physical deficiency, disorder or abnormality which causes the person to have serious difficulty controlling his or her dangerous behavior. (§ 1801.5.) To initiate a commitment under the EDA, the CYA must request, and the prosecuting attorney must file, a petition requesting that the ward's detention be extended. (§ 1800.) The ward is entitled to notice of the petition and a probable cause hearing, followed by a jury trial. (§§ 1801, 1801.5.) The detention is for up to two years. (§ 1802.) Within that two-year period, unless the person has been discharged under the provisions of section 1766, a new application for continued detention may be filed if deemed necessary. (§ 1802.) The EDA includes no requirement that the ward be housed separately from other wards. At any time during the detention, the Department of the Youth Authority may transfer any ward over 21 years of age to state prison "to protect other persons in the custody of the department." (§ 1802.)

### 2. *Standard of Review*

■ We review the constitutionality of a statute de novo. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799–801 [35 Cal.Rptr.2d 418, 883 P.2d 960].) Although we do not defer to the trial court's interpretation of the statute, we give some deference to the Legislature in that we must presume the statute is valid "unless its unconstitutionality clearly, positively, and unmistakably appears." (*People v. Falsetta* (1999) 21 Cal.4th 903, 913 [89 Cal.Rptr.2d 847, 986 P.2d 182].) With respect to the EDA, the Supreme Court in *Howard N.* stated, "[t]he Legislature has made it clear over the history of the extended detention scheme that it is committed to making the scheme constitutional." (*Howard N., supra*, 35 Cal.4th at p. 133.) And, "if 'feasible within bounds set by their words and purpose, statutes should be construed to preserve their constitutionality.' [Citations.]" (*Id.* at p. 132.)

### 3. *Framework of Equal Protection Analysis*

██ Both the federal and California Constitutions provide that no person shall be deprived of equal protection of the laws. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a).) To succeed on a claim of denial of equal protection, a person must first show that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner. (*Cleburne v. Cleburne Living Center, Inc.* (1985) 473 U.S. 432, 439 [87 L.Ed.2d 313, 105 S.Ct. 3249]; *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 [127 Cal.Rptr.2d 177, 57 P.3d 654] (*Cooley*).)

" 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' [Citation.]" (*Cooley, supra*, 29 Cal.4th at p. 253.) "If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold. [Citation.]" (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1155 [88 Cal.Rptr.2d 696].)

When a showing is made that two similarly situated groups are treated disparately, the court must then determine whether the government has a sufficient reason for distinguishing between them. " ' "The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." ' [Citation.]" (*Cooley, supra*, 29 Cal.4th at p. 253.)

"In resolving equal protection issues, the United States Supreme Court has used three levels of analysis. Distinctions in statutes that involve suspect classifications or touch upon fundamental interests are subject to strict scrutiny, and can be sustained only if they are necessary to achieve a compelling state interest. Classifications based on gender are subject to an intermediate level of review. But most legislation is tested only to determine if the challenged classification bears a rational relationship to a legitimate state purpose. [Citations.]" (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1200 [39 Cal.Rptr.3d 821, 129 P.3d 29].)

Defendant contends that EDA commitments trigger strict scrutiny because they involve a restraint on personal liberty. (See *People v. Olivas* (1976) 17 Cal.3d 236, 250–251 [131 Cal.Rptr. 55, 551 P.2d 375] [holding that strict scrutiny applied to an equal protection challenge to a statute that allowed a defendant who had been convicted in an adult criminal prosecution to be committed to the CYA for a longer term than he would have received if

sentenced to prison as an adult]; see also *People v. Green* (2000) 79 Cal.App.4th 921, 924 [94 Cal.Rptr.2d 355] ["Strict scrutiny is the appropriate standard against which to measure claims of disparate treatment in civil commitment"]; *People v. Hubbart* (2001) 88 Cal.App.4th 1202, 1217, 1231 [106 Cal.Rptr.2d 490].)

In addressing an earlier version of the EDA, our Supreme Court stated that "although the procedures leading to the commitment of various classes of people for treatment or to protect society from them need not be identical in all respects, none may deny to one such class fundamental rights or privileges accorded to another unless a rational basis for the distinction exists. Thus we must evaluate the procedures adopted to implement sections 1800–1803 in light of other statutory provisions governing involuntary commitment. [Citation.]" (*In re Gary W.* (1971) 5 Cal.3d 296, 304 [96 Cal.Rptr. 1, 486 P.2d 1201], superseded by statute on other grounds as stated in *People v. Superior Court (Cheek)* (2001) 94 Cal.App.4th 980, 988, 990 [114 Cal.Rptr.2d 760]; see also *People v. Lopez* (2006) 137 Cal.App.4th 1099, 1109 [40 Cal.Rptr.3d 789].) " 'Variation of the length and conditions of confinement, depending on degrees of danger reasonably perceived as to special classes of persons, is a valid exercise of power.' [Citation.]" (*People v. Hubbart, supra*, 88 Cal.App.4th at p. 1217.)

### 4. *Evaluation Procedures*

██ Defendant contends that the EDA deprived him of equal protection because SVP's and MDO's benefit from more stringent screening procedures than those that are applied to wards committed under the EDA. The SVPA requires a standardized screening process with the recommendation of at least two psychiatrists or psychologists appointed by the Director of Mental Health, and if those examiners disagree, two independent professionals must be appointed. (§ 6601, subds. (d)–(h).) Similarly, the MDO statutes require evaluation by two independent psychologists or psychiatrists. (Pen. Code, §§ 2966, subd. (a), 2978.) In contrast, the EDA requires an evaluation by one mental health professional designated by the CYA director only if the Department of the Youth Authority has failed to act on a request for commitment action by the Youth Authority Board. (§ 1800.5.)

The SVPA, however, does not require that persons receive treatment prior to the commencement of long-term commitment. (See *People v. Hubbart, supra*, 88 Cal.App.4th at p. 1221.) And MDO's must only have "been in treatment for the severe mental disorder for 90 days or more within the year prior to the prisoner's parole or release." (Pen. Code, § 2962, subd. (c).) In contrast, as discussed at more length below, the CYA is required to provide continuing treatment for wards throughout their original commitment and

during any extension of the commitment. Thus, an extensive record of the ward's behavior, treatment, and response to treatment has been created before the EDA proceedings commence—in the present case, various witnesses noted that defendant's paper record of his treatment while at CYA was 14 inches high. The Youth Authority Board must include a copy of the ward's file and the documentation upon which the Youth Authority Board made its decision when requesting extended commitment. (§ 1800.5.) This record serves as an additional means of minimizing error in the probable cause determination. Thus, we conclude that with respect to the procedures by which extended commitments are initiated, wards of the CYA are not similarly situated to SVP's or MDO's.

Moreover, on appeal, any error relating to probable cause findings is subject to harmless error review. In *People v. Scott* (2002) 100 Cal.App.4th 1060 [123 Cal.Rptr.2d 253], the defendant, who was committed as an SVP, contended the evidence was insufficient to support extending his commitment because only one expert testified for the People that he was an SVP, although the SVPA requires two concurring expert opinions before the commencement of the petition process. (§ 6601, subds. (c), (d).) The court held that the SVPA requirement for two prepetition evaluations did not affect the disposition of the merits, but was rather a collateral procedural condition to ensure that SVP proceedings were initiated only when there was a substantial basis for doing so. " 'After the petition is filed, rather than demonstrating the existence of the two evaluations, the People are required to show the more essential fact that the alleged SVP is a person likely to engage in sexually violent predatory criminal behavior. [Citation.]' [Citation.]" (*People v. Scott, supra,* 100 Cal.App.4th at p. 1063, quoting *People v. Superior Court (Preciado)* (2001) 87 Cal.App.4th 1122, 1130 [105 Cal.Rptr.2d 159]; see *People v. Ward* (2002) 97 Cal.App.4th 631, 635 [118 Cal.Rptr.2d 599].)

In *In re Wright* (2005) 128 Cal.App.4th 663 [27 Cal.Rptr.3d 281], the court stated, "Irregularities in the preliminary hearing under the [SVPA] are not jurisdictional in the fundamental sense and are . . . subject to harmless error review. [Citation.] Thus, reversal is not necessary unless the individual can show that he or she was denied a fair trial or had otherwise suffered prejudice. [Citation.]" (*Id.* at p. 673.) The court found no prejudice to the defendant when he had had a fair trial at which he had been represented by counsel, had presented his own expert witness, and had cross-examined the People's witnesses. (*Ibid.*) The court explained, "The only possible prejudice [the defendant] could have suffered was in the fact that the petition actually proceeded to trial; however, our high court concluded that the erroneous denial of a motion to dismiss an information under Penal Code section 995 will not be reversed on appeal in the absence of a showing that the defendant was deprived of a fair trial, or otherwise prejudiced in the ability to mount a defense. [Citation.] 'The same principle applies in other contexts involving

allegedly improper rulings in criminal cases, even where it is claimed there had been a violation of constitutionally protected rights. [Citations.]' [Citation.] Thus, the fact that [the defendant] was compelled to 'participate in an otherwise fair trial' does not demonstrate prejudice. [Citation.]" (*Id.* at pp. 673–674.)

Here, likewise, defendant had a fair trial, and any error in the initiation of the proceedings was harmless.

### 5. *Review During Commitment Period*

Defendant next contends that the EDA violates equal protection principles because SVP's and MDO's benefit from means to gain review during the commitment period that are not available to wards under the EDA. Defendant contends that an SVP may petition for release and obtain a full court hearing annually. (§§ 6605, 6607, 6608; *People v. Cheek* (2001) 25 Cal.4th 894, 898–899 [108 Cal.Rptr.2d 181, 24 P.3d 1204].) Defendant also contends that an MDO on parole must be released if he is in remission and may be kept in remission without treatment (Pen. Code, § 2968) and may have a review by the Board of Prison Terms at each presumptive early parole date (Pen. Code, §§ 3000.1, subd. (b), 3001; Cal. Code Regs., tit. 15, §§ 2535, 2580) and that after expiration of the MDO's parole period, the commitment must be reviewed annually (Pen. Code, § 2972).

Defendant contends that, in contrast, the EDA provides only for an annual internal CYA review at which the CYA may discharge the committee (§§ 1766, 1802), the EDA provides no opportunity for a ward to petition a court for release during the two-year commitment term, and the EDA does not require the CYA to release a committee who is no longer a danger to the public.

We will assume for purposes of argument that wards under the EDA are similarly situated with respect to MDO's and SVP's for purposes of a right to review during the commitment period. (See *People v. Hubbart, supra,* 88 Cal.App.4th at p. 1217.) However, we find no unconstitutional disparate treatment.

First, we disagree that the EDA does not require the CYA to release a committee who is no longer a danger to the public. In *In re Schmidt* (2006) 143 Cal.App.4th 694 [49 Cal.Rptr.3d 477], the court held that the CYA has the authority to release conditionally a person committed under section

1800.[5] Section 1802 provides that "When an order for continued detention is made as provided in Section 1801, the control of the authority over the person shall continue, subject to the provisions of this chapter . . . ." Thus, when a person's commitment is extended, "the CYA's control over that person continues to the extent authorized by the other provisions of the chapter containing section 1802, which is chapter 1 of division 2.5 of the Welfare and Institutions Code." (*In re Schmidt, supra*, 143 Cal.App.4th at p. 712.)

Section 1765 provides, "(a) Except as otherwise provided in this chapter, the Department of the Youth Authority and the Youth Authority Board shall keep under continued study a person in their control and shall retain him or her, subject to the limitations of this chapter, under supervision and control so long as in their judgment that control is necessary for the protection of the public. [¶] (b) The board shall discharge that person as soon as in its opinion there is reasonable probability that he or she can be given full liberty without danger to the public."

Section 1766, subdivision (a)(1), allows the CYA to release conditionally a person committed under the EDA under supervision and with conditions. And section 1766, subdivision (a)(6), "authorizes the CYA to discharge [a ward] 'from its control when it is satisfied that discharge is consistent with the protection of the public.' " (*In re Schmidt, supra*, 143 Cal.App.4th at pp. 711–712.)

Moreover, wards in the custody of the CYA must be periodically reviewed. Section 1720, subdivision (b) provides, "The Division of Juvenile Facilities shall periodically review the case of each ward for the purpose of determining whether existing orders and dispositions in individual cases should be modified or continued in force. These reviews shall be made as frequently as the department considers desirable and shall be made with respect to each ward at intervals not exceeding one year." The review must be in writing and must verify the ward's treatment or program goals to assure the ward is receiving the required treatment. (§ 1720, subd. (e).) If the ward's case is not reviewed within 15 months of a prior review, the ward may petition the court that committed him for a discharge order. (§ 1720, subd. (d).) The court must be served with copies of the ward's annual reviews and must discharge the ward unless satisfied of the need for further control (§ 1720, subds. (d), (f).)

These review procedures under the CYA appear to be at least as stringent as those conducted by the Board of Prison Terms for MDO's under

---

[5] The court in *In re Schmidt* observed that the EDA scheme "does not include detailed procedures for conditional release" and invited the Legislature to provide statutory direction regarding the appropriate procedures. (*In re Schmidt, supra*, 143 Cal.App.4th at pp. 715–716.) We concur in that invitation.

Penal Code sections 3000.1, subdivision (b), and 3001. And the ward may petition the court for a discharge order if the review is not timely conducted. (§ 1720, subds. (d), (f).) Thus, we conclude that the review procedures under the EDA do not violate equal protection.

### 6. Broader Commitment Criteria

Defendant next argues that the MDO laws and the SVPA apply to much narrower groups of people than are subject to the EDA, and an adult CYA ward may be committed under circumstances that would not apply to an adult prisoner.

To qualify for an SVPA commitment, the person must have been convicted of sexually violent offenses against two victims. (§ 6600.) A single prior juvenile adjudication may be used as a qualifying offense if the juvenile was 16 years of age or older when he or she committed the offense; the offense was sexually violent; the juvenile was adjudged a ward within the meaning of section 602; and the juvenile was committed to CYA for the sexually violent offense. (§ 6600, subd. (g).)

The MDO laws require that the commitment offense be one of 14 enumerated serious crimes or a crime involving use of a weapon or force, causing great bodily injury, or threatening to cause substantial injury. (Pen. Code, § 2962, subd. (e).) In addition, the person must have been treated for his or her mental disorder during the prison term. (Pen. Code, § 2962, subd. (c).)

In contrast, under the EDA, there are no particular qualifying offenses, and an EDA commitment may be imposed on any adult CYA ward.

In a similar context, courts have recognized that SVP's and MDO's are not even similarly situated to each other for the purpose of the definition of mental disorder. (People v. Calderon (2004) 124 Cal.App.4th 80, 94 [21 Cal.Rptr.3d 92] (Calderon).) In Calderon, the court explained: "[T]he definition of mental disorder under the SVPA is less exacting than the one under the MDO commitment scheme. [Citation.] Also, SVPA requires a finding that the person is likely to commit violent sex crimes, whereas MDO commitments require a present threat of harm. [Citation.]" (Ibid.) In People v. Lopez (2004) 123 Cal.App.4th 1306 [20 Cal.Rptr.3d 801], the court similarly held

that the SVPA does not violate equal protection by defining "mental disorder" more broadly than does the MDO Act. (See also *Hubbart v. Knapp* (9th Cir. 2004) 379 F.3d 773.)[6]

In *People v. Buffington, supra,* 74 Cal.App.4th at page 1157, the court held that the SVPA did not violate equal protection principles by imposing disparate treatment when compared to the MDO laws and other civil commitment statutes, including the not guilty by reason of insanity defense (Pen. Code, § 2960 et seq.) and the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.). The defendant argued that the SVPA's definition of mental disorder was less severe, the SVPA's evidentiary standards were easier to meet, and the SVPA provided less treatment for mental disorders of SVP's than did the other statutory schemes. (*People v. Buffington, supra,* 74 Cal.App.4th at p. 1155.) The court reviewed each challenge separately. The court first found that SVP's were similarly situated for purposes of the mental disorder definition to other persons involuntarily committed under the other statutory schemes. (*Id.* at p. 1156.) The court found, however, that all groups were similarly treated. The court explained that regardless of the specific terms used, all the statutory schemes "encompass a current mental condition that renders a person dangerous beyond his or her control. Thus, SVP's are treated similarly for these purposes of the law." (*Id.* at p. 1157.) The court further explained, "However, this is not to say that persons committed under California's various civil commitment statutes are similarly situated in all respects. They are not. For example, the SVPA restricts commitments to those who have committed sexually violent offenses and who have the propensity due to their mental disorder to commit further acts of sexual violence. The MDO scheme restricts commitments to felons who are violent because of their mental disorder and who remain a danger because of that disorder. '[T]he [L]egislature is free to recognize degrees of harm, and it may confine its restrictions to those classes of cases where the need is deemed to be clearest.' [Citation.] The Legislature 'may adopt more than one procedure for isolating, treating, and restraining dangerous persons; and differences will be upheld if justified.' [Citation.] In line with these equal protection principles that sanction certain differences in degree, the Legislature has not acted unconstitutionally by failing to exclude personality or adjustment disorders from the SVPA's definition of 'diagnosed mental disorder'; indeed, the Kansas SVP Act's definition of mental disorder at issue in *Hendricks*[, *supra,* 521 U.S. 346] expressly included 'personality disorder' without violating constitutional principles. The definition of 'mental disorder' under both the

---

[6] We note that for purposes of argument, the court in *People v. Hubbart, supra,* 88 Cal.App.4th at page 1217, assumed that SVP's and MDO's were similarly situated for purposes of the definitions of mental disorder under the respective statutory schemes governing those groups.

SVPA and the MDO Act still rests on a similar foundation for equal protection purposes." (*Id.* at pp. 1158–1159.)

Moreover, in *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138 [81 Cal.Rptr.2d 492, 969 P.2d 584], the California Supreme Court rejected the defendant's challenge that his commitment under the SVPA violated equal protection principles "because the criteria for commitment, particularly dangerousness, are less exacting than the standards used under analogous statutory schemes." (19 Cal.4th at p. 1168.) The court held that the SVPA, like the other commitment statutes, required a finding of a current mental disorder that gives rise to current dangerousness based on an impairment of the ability to control violent behavior. Thus, the court held, that even assuming SVP's are similarly situated to other persons subject to civil commitment, the relevant statutes did not lead to disparate treatment. (19 Cal.4th at pp. 1169–1170.)

We likewise conclude that, even if wards committed under the EDA are similarly situated to MDO's or SVP's, the statutes defining the underlying offenses do not lead to disparate treatment.

### 7. Conditions of Placement

Defendant contends that MDO's and SVP's are placed in nonpunitive conditions in that they are both committed to the Department of Mental Health and must be housed in a state hospital, not a prison. (Welf. & Inst. Code, §§ 6600, 6600.05, 6604; Pen. Code, §§ 2962, 2964.) In contrast, under the EDA, wards are recommitted to the CYA where they are placed with the general population of wards and are treated no differently from them.

In *Jones v. Blanas* (9th Cir. 2004) 393 F.3d 918, the defendant was confined for a year in the general criminal population of the county jail while commitment proceedings were pending under the SVPA. The court held that when an SVPA detainee was held in conditions identical to, similar to, or more restrictive than those in which his criminal counterparts were held, the court would presume that the detainee was being subjected to punishment in violation of the due process clause, and thus summary judgment was improper on the defendant's substantive due process claim. (393 F.3d at pp. 934–935.)

The Supreme Court has held, however, that "[t]he commitment and detention for treatment of a physically dangerous Youth Authority ward does not of itself deny equal protection. . . . [T]he Legislature has enacted a unified framework of laws providing for the involuntary commitment of persons who present a danger to society. It is not unreasonable that the Legislature should

devise several means by which to detect and isolate persons who may present a danger to society. It is particularly appropriate that a prior contact with the system of criminal justice should be an event which may give rise to such an inquiry inasmuch as the antisocial act which brought the defendant before the court may be symptomatic of a condition which instills a propensity to commit such acts. The legislative decision to provide for continuation of treatment of Youth Authority wards who have reached their majority under Youth Authority control, rather than transferring their treatment to the Department of Mental Hygiene or another agency of the state is neither unreasonable nor arbitrary. [Citations.]" (*In re Gary W., supra*, 5 Cal.3d at p. 304, fn. omitted.) Thus, we conclude that the conditions of placement do not violate equal protection.

### 8. *Requirement of Treatment for Mental Disorder*

 Defendant further argues that both MDO's and SVP's must be provided mental health treatment, but that the EDA contains no such requirement. An SVP is committed to the Department of Mental Health and must be housed in a state hospital, not a prison. (§§ 6600, 6600.05, 6604.) Treatment must be provided for an SVP's diagnosed mental disorder. (§ 6606, subd. (a); see *Orozco v. Superior Court* (2004) 117 Cal.App.4th 170, 176–177 [11 Cal.Rptr.3d 573].)

An MDO is also committed to the Department of Mental Health and must be provided with necessary treatment, which may be on an outpatient basis. (Pen. Code, §§ 2962, 2964.) An MDO must have been treated while still in prison, and the treatment must have been continuously provided. (Pen. Code, §§ 2960, 2962, subd. (c), 2970, 2972, subd. (f).) Courts have held that "no significant difference exists regarding treatment provisions once a person is found to be a[n] MDO or an SVP." (*People v. Poe* (1999) 74 Cal.App.4th 826, 833 [88 Cal.Rptr.2d 437]; accord, *People v. Starr* (2003) 106 Cal.App.4th 1202, 1208 [131 Cal.Rptr.2d 616].)

Defendant argues that the EDA does not require the CYA to provide treatment. He bases this argument, in part, on the fact that a provision of the EDA, which formerly explicitly required the CYA to provide treatment for recommitted wards, was deleted during statutory revisions in 1998. Specifically, former section 1801 provided that if the court formed the opinion at the probable cause hearing that discharge of the ward would be dangerous to the public because of the ward's mental or physical deficiency, disorder, or abnormality, the court should order the CYA to continue treatment of the person. (Former § 1801, added by Stats. 1963, ch. 1693, § 4, p. 3323.) The current version of that section no longer includes any mention of treatment.

However, defendant looks at the statutory amendment in isolation without considering the overall statutory scheme and the obligations of the CYA. First, section 1700, which sets forth the purpose of the Youth Authority Act (§§ 1700–1915), provides, "The purpose of this chapter is to protect society from the consequences of criminal activity and to that purpose community restoration, victim restoration, and *offender training and treatment shall be substituted for retributive punishment and shall be directed toward the correction and rehabilitation of young persons who have committed public offenses.*" (Italics added.)

Second, the CYA has an express continuing obligation to wards to provide treatment during their confinement. Section 1802 provides that when an order for continued detention is made, "the control of the authority over the person shall continue, *subject to the provisions of this chapter . . . .*"[7] (Italics added.) In this regard, section 1720 provides, "(b) The Division of Juvenile Facilities shall periodically review the case of each ward for the purpose of determining whether existing orders and dispositions in individual cases should be modified or continued in force. These reviews shall be made as frequently as the department considers desirable and shall be made with respect to each ward at intervals not exceeding one year. [¶] . . . [¶] (e) Reviews conducted by the division pursuant to this section shall be written and shall include, but not be limited to, the following: *verification of the treatment or program goals and orders for the ward to ensure the ward is receiving treatment and programming that is narrowly tailored to address the correctional treatment needs of the ward and is being provided in a timely manner that is designed to meet the parole consideration date set for the ward*; an assessment of the ward's adjustment and responsiveness to treatment, programming, and custody; a review of the ward's disciplinary history and response to disciplinary sanctions; *an updated individualized treatment plan for the ward that makes adjustments based on the review required by this subdivision; an estimated timeframe for the ward's commencement and completion of the treatment programs or services*; and a review of any additional information relevant to the ward's progress." (Italics added.)

Finally, the Supreme Court has unequivocally declared that treatment of wards is required during extended detention: "[T]he Youth Authority is under an affirmative obligation to provide treatment for the ward's mental or physical abnormality when he is committed pursuant to [sections 1800 to 1803]. Detention of such wards without treatment is unauthorized by statute. Accordingly, any person confined pursuant to a section 1800 commitment, but who is not receiving treatment[,] may seek his release through appropriate habeas corpus procedures. [Citations.]" (*In re Gary W., supra,* 5 Cal.3d at

---

[7] Chapter 1 of the Youth Authority Act comprises sections 1700 through 1915.

p. 303.)[8] We conclude that the EDA requires continuing treatment for wards and therefore does not violate equal protection.

### D. *Other Constitutional Challenges*

**(15)** Defendant contends that the extension of his detention was unconstitutional because the EDA is penal in nature and violates both substantive due process and the prohibition against cruel and unusual punishment. Both the federal and California Constitutions require that no person shall be deprived of liberty without due process of law. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7.) In *Howard N.*, the Supreme Court stated the due process requirements for civil commitment: "The high court has repeatedly 'recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.' [Citation.]" (*Howard N.*, *supra*, 35 Cal.4th at p. 127.)[9]

In *Howard N.*, the court declined to reach the issue whether the EDA is a penal rather than a civil commitment scheme, and therefore should be judged under the more rigorous standards of substantive due process, because the issue was not raised in the defendant's petition for review. (*Howard N.*, *supra*, 35 Cal.4th at p. 138, fn. 8.) However, the California Supreme Court has already spoken on the issue, stating that sections 1800 through 1803 have a "demonstrably civil purpose." (*In re Gary W.*, *supra*, 5 Cal.3d at p. 302.) The court further stated that "the Legislature has been at pains to assure that confinement pursuant to sections 1800–1803 shall be only for the purpose of treatment." (*Id.* at p. 301.)[10]

Moreover, the premise underlying defendant's argument that the EDA is penal in nature is his assertion that the EDA imposes incarceration without

[8] Although the court in *In re Gary W.* based its holding in part on the language of former section 1801 concerning the requirement for treatment of a ward as to whom probable cause has been found for extended detention (*In re Gary W.*, *supra*, 5 Cal.3d at p. 303), in our view the general statutory requirement for treatment as set forth above leads to the same result. As noted above, we are required to assume the Legislature intended the statutory scheme to be constitutional "unless its unconstitutionality clearly, positively, and unmistakably appears." (*People v. Falsetta*, *supra*, 21 Cal.4th at p. 913.)

[9] Citing *People v. Getty* (1975) 50 Cal.App.3d 101, 113–114 [123 Cal.Rptr. 704] and *In re Cavanaugh* (1965) 234 Cal.App.2d 316, 319 [44 Cal.Rptr. 422], the People argue that the EDA is civil in nature because it merely extends the original civil Youth Authority commitment. However, the California Supreme Court rejected this position in *Howard N.*, in which the court stated, "[T]he [EDA] scheme involves neither a juvenile proceeding nor an extension of a prior juvenile court proceeding." (*Howard N.*, *supra*, 35 Cal.4th at p. 126; see also *In re Schmidt*, *supra*, 143 Cal.App.4th at p. 707 ["Instead, a proceeding under section 1800 results in a modification of the dispositional order. [Citation.]")

[10] The *Gary W.* court further held that if a person confined under the EDA does not in fact receive treatment, he may seek relief through habeas corpus procedures. (*Gary W.*, *supra*, 5 Cal.3d at p. 303.)

any requirement of treatment. As discussed above, we have rejected that premise, as did the California Supreme Court in *In re Gary W., supra*, 5 Cal.3d 296, which held that the CYA has an affirmative obligation to provide treatment for wards under extended detention. We thus conclude that defendant's extended detention under the EDA does not violate substantive due process.

## IV. DISPOSITION

The order appealed from is affirmed.

King, J., and Miller, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 8, 2007, S153139.