Filed 8/31/16  P. v. Jin CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B267638 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA060354) |
| v. | |
| JAMES JONGHO JIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Elden S. Fox, Judge. Reversed and remanded with directions.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Eric J. Kohm, Deputy Attorney General, for Plaintiff and Respondent.

_____

On April 18, 2007, James Jongho Jin was found not guilty by reason of insanity of mayhem. (Pen. Code,[1] § 203.) The court ordered him committed to Patton State Hospital pursuant to section 1026 for a maximum term of 21 years. In 2009, Jin transitioned to a Forensic Conditional Release Program ("CONREP") for community outpatient treatment. Since 2009, except for a brief period of rehospitalization in 2011, Jin has resided in the CONREP residential or supervised board and care facilities under the auspices of Gateways Hospital and Mental Health Center ("Gateways"). Pursuant to section 1026.2, Jin applied for restoration of sanity, and following a trial on the application, the jury found Jin's sanity had not been restored. (§ 1026.2, subds. (e), (f).) Jin appeals, claiming the district attorney engaged in prejudicial misconduct that violated Jin's right to a fair trial, which resulted in the denial of his application. We agree and reverse for a new restoration of sanity trial.

## FACTUAL AND PROCEDURAL BACKGROUND

Following Jin's transition from Patton State Hospital to the Gateways residential and board and care facilities in 2009, Jin has received individual and group therapy and medication, and has been subject to strict supervision. He has consistently and voluntarily taken his medication for the nine years since his initial hospitalization in 2007. While at Gateways, he has never had a positive drug or alcohol test, which have been administered randomly four times per month. He has had two Alcoholics Anonymous (AA) sponsors, he has completed the AA 12-step program, and he continues to attend AA meetings three times a week. He also attends a nearby Korean church. Over the seven years since Jin has been at Gateways, it has never been reported he presents a danger to himself or others.

In 2011, after Jin's mother died, Jin became suicidal and called the police. He was rehospitalized for seven months, but he stabilized quickly, and returned to the community in January 2012.

---

[1] Undesignated statutory references are to the Penal Code.

At the time of trial, Jin was living in the Gateways "satellite" facility, a supervised board and care facility. The Gateways program has four levels of care and supervision: intensive, intermediate, supportive, and transitional. Gateways typically does not recommend a patient for restoration of sanity until he or she reaches the transitional level of supervision, at which point the individual has little contact with the program and is likely working full time and living independently. At the time of trial, Jin was at the intensive level of supervision and had never progressed beyond intermediate to the supporting or transitional levels of care.

**1. *Jin's evidence in support of his application for restoration of sanity***

Dr. Ronald Markman, the psychiatrist who had originally diagnosed Jin with paranoid schizophrenia in connection with his 2006 trial, and Dr. Ronette Goodwin, a psychologist, testified in support of Jin's restoration to sanity.

Dr. Markman examined Jin in connection with these proceedings. During the examination, Dr. Markman found Jin to be "alert, oriented, and responsive." Jin was cooperative and very straightforward in discussing his medical and psychiatric history and the symptoms he had experienced over the years, including auditory hallucinations. Dr. Markman also reviewed Jin's medical history and reports from CONREP. The CONREP reports contained no indication of current psychosis, nor did the doctor observe any symptoms in his examination. Dr. Markman found no evidence that Jin had abused drugs or alcohol or exhibited any dangerous or aggressive behavior within the last nine years. He further found that Jin voluntarily took his medications as prescribed, and had responded positively to the psychotropic medications he had received.

Based on the examination, Jin's performance on a standardized psychiatric test, and a review of Jin's medical history and the CONREP reports, Dr. Markman concluded that Jin does not represent a danger to society or to others as long as he remains on his medication. Dr. Markman opined that Jin's paranoid schizophrenia is under control and in remission. In Dr. Markman's opinion, Jin now takes his condition seriously and is likely to maintain his medication regimen.

3

Dr. Markman conceded that if Jin were to discontinue his medication for whatever reason, he would be very dangerous. The doctor further acknowledged that prior to 2006, when Jin had been released unsupervised from the hospital, he stopped taking his medication, his condition deteriorated, and he began experiencing auditory hallucinations. Indeed, as a direct result of stopping his medications, Jin committed mayhem in this case within two years of the conclusion of probation in a 2000 arson case.

Dr. Ronette Goodwin, who examined Jin in April 2014 and August 2015, also recommended Jin's sanity be deemed restored. In reaching her conclusion, Dr. Goodwin reviewed the CONREP reports, Jin's medical, employment, substance abuse, and criminal history, as well as his family background, education, and performance on a standardized psychiatric risk assessment. According to the CONREP reports Dr. Goodwin reviewed, Jin was psychiatrically stable and was not exhibiting any psychiatric symptoms. He was complying with his medication regimen and was participating in AA with two sponsors. While there may have been some concern about psychiatric symptoms, none of the reports Dr. Goodwin reviewed indicated that Jin had been found dangerous over the seven years he had resided at Gateways. Moreover, in nine years, Jin had never refused medication and he had passed all random drug and alcohol tests.

In Dr. Goodwin's opinion, Jin is highly motivated and is likely to continue his medication and treatment if released. Dr. Goodwin found that Jin has insight into his mental illness, he understands the need to take his medication, and he now knows how to care for himself. Prior to committing mayhem in 2006, Jin lacked such insight: He was in denial about his mental illness, and he was not receiving appropriate treatment for his condition. Dr. Goodwin also noted that Jin's current medications have fewer and less severe side effects than his previous medications.

Dr. Goodwin discussed Jin's relapse prevention plan with him, which would include treatment through the Asian Pacific Treatment Center. Dr. Goodwin testified that the Asian Pacific Treatment Center has all the same services that Gateways provides to keep a person stable: housing, education, vocation, therapy, and medication. Dr. Goodwin also noted that Jin had handled the major stressors of his mother's death and his

4

brother moving away quite well, remaining compliant with his medication protocol and reaching out to staff for assistance. Finally, Jin had expressed remorse for the incidents that had resulted in his hospitalization in 2006.

Jin also testified. At the time of trial he was 45 years old. He had experienced his first "psych break" as a result of paranoid schizophrenia at the age of 23. Jin explained that before the Gateways program, he had not been educated about his mental illness. However, in the nine years since his hospitalization, he has gained tremendous insight into his mental illness and understands it to be a lifelong disease with no cure. He compared his illness to being diabetic, stating, "I have to really take my medication no matter what happens." He further testified that if he were to stop taking his medication, he would hear voices and become delusional. He insisted he never wants to feel that way again.

Jin testified that he "loves" AA and enjoys going to AA meetings. Asked if he is forced to go to meetings, Jin responded, "No. . . . I don't want to do this again to be honest with you. . . . I made a big mistake and, you know, I want to stay sober and continue to take my medication so I can move on with my life." Jin's former AA sponsor, Jacob Gallagher,[2] testified that Jin had shared his background and diagnosis with him, and had told Gallagher he was taking medication for paranoid schizophrenia and Parkinson's torticollis. Over the six years of the sponsorship, Jin and Gallagher became friends and were very close. They spent a great deal of time together, and Jin seemed stable, expressing remorse over his conduct that resulted in his 2007 hospitalization. Jin had many friends in AA and enjoyed being part of that community.

Jin pleaded no contest to arson in 2000. After three years' probation, the case was dismissed pursuant to Penal Code section 1203.4. Shortly thereafter, Jin was diagnosed with Parkinson's torticollis, and his neurologist told him the condition was caused by

---

[2] After six years of having Gallagher as his sponsor, Gateways required Jin to find a new sponsor because Jin's therapist did not believe Gallagher was taking Jin's program seriously. Jin did change sponsors and gets along well with the new sponsor.

Haldol, the psychotropic medication Jin was taking at the time to control his schizophrenia. Jin stopped taking his medication, and soon decompensated. By 2006 he was hearing voices and acted on those auditory commands when he committed mayhem in the instant case.

Jin's long-term goal is to return to the University of Southern California (USC) to earn his bachelor of arts degree.[3] If that does not work out, however, he plans to get a part-time job and enroll in a California State University program. He hopes to have a relationship with a woman, something his therapist at Gateways has actively discouraged. Jin testified he has been medication-compliant for nine years, and insisted that his anxiety over unresolved issues has never made him not want to take his medication or caused him to stop.

## 2. *The People's evidence in opposition to restoration*

In opposition to the application, the People offered the testimony of Dr. Sanjay Sahgal, a psychiatrist, who had interviewed Jin a year earlier. Based on his assessment of Jin's current symptoms during that interview, conversations with Jin's Gateways psychologist and Jin's brother, and his review of Jin's medical records and the CONREP reports, Dr. Sahgal opined that Jin does not present a substantial danger due to his schizophrenia in his current treatment environment. However, Dr. Sahgal determined that Jin's plan for maintaining his stability upon restoration of sanity was not viable, and Jin would be at risk for deteriorating and engaging in erratic or dangerous behaviors.

Specifically, Dr. Sahgal found Jin's plan to return to USC to complete his degree and obtain a job at the "Department of Immigration" to be unrealistic, given Jin's belief that he could accomplish both goals by simply showing up and explaining his history. Dr. Sahgal opined that Jin's insight and understanding as to what was required to implement his plan was minimal and would lead to confusion and stress, increasing the likelihood of relapse. The doctor noted Jin had been unable to successfully enroll at Los

---

[3] Jin completed seven semesters of study at USC before his hospitalization in the current case.

6

Angeles Community College, and found Jin's belief that he would not need to reapply to USC to resume his studies to be unreasonable. Dr. Sahgal opined that inaccurate assumptions and rigid thinking on Jin's part had led to decompensation in the past and constituted risk factors for Jin's future behavior.

Dr. Sahgal also expressed doubt about the viability of Jin's plan for self-care. Jin's plan included receiving services from the Asian Pacific Treatment Center where Jin had previously been treated and had gone off his medication. In Dr. Sahgal's opinion, Jin had insufficient family and community support to ensure that he would maintain his medication regimen. He noted that although Jin's brother cares very much for Jin, he did not want Jin to reside with him, nor was he interested in assisting Jin in finding an apartment. Dr. Sahgal found the brother's willingness to help from a distance and check in "at least once a month" to fall short of the level of support Jin was receiving from Gateways.

Dr. Sahgal acknowledged that in 16 years, he has never heard of a case in which Gateways has recommended restoration of sanity. None of his colleagues knew of any such case, and in his own research he failed to find a single instance of a recommendation of restoration by Gateways.

Dr. Sahgal found that Jin has taken his medications consistently since his admission to Patton and has never refused or been forced to take them. The doctor further noted that since he has been at Gateways, Jin has never once tested positive for alcohol or marijuana. Dr. Sahgal saw no indications of any dangerous or aggressive behavior in any of the CONREP reports.

Dr. Sahgal stated that he had not been asked to reassess Jin prior to testifying, and conceded that his report based on his interview of Jin nearly a year before was "stale." He further admitted that Jin is a very different person than he was before 2009, given nine years of medication compliance, therapy, AA meetings, and insight into his illness. Indeed, even in his admittedly "stale report," Dr. Sahgal concluded, " 'I would expect Mr. Jin to have a very good chance of being restored to sanity in the near future.' "

The People also presented the testimony of Dr. Nicole Paglione, a psychologist, and the Director of Evaluations with Gateways CONREP. She has personally spoken with Jin on three or four occasions.

Dr. Paglione conceded she has never personally recommended any person for restoration of sanity, and during her entire tenure at Gateways, only one person has been recommended.

Dr. Paglione acknowledged that, according to the CONREP reports, Jin had complied with his medication protocol since 2006, and had never refused to take medication despite losing his mother and his brother moving away. She further admitted that Jin's symptoms are manageable with psychiatric medications. Outside of suicidal thoughts in 2011 and a physical altercation with another board and care resident, Dr. Paglione conceded that Jin has never exhibited dangerous tendencies or posed a threat to others since his release from the state hospital. Moreover, she allowed that Jin had consistently complied with Gateways's rules and regulations, and had never tested positive for drugs or alcohol since his hospitalization in 2006. However, Dr. Paglione noted that around June 2014, Jin began to make bizarre statements in his individual therapy sessions; he was fixated on race, the weather, and the war in the Middle East. He shaved off his eyebrows and dyed his hair blonde. According to Dr. Paglione, such psychotic thought processes as Jin was exhibiting are regarded as warning signs of psychiatric decompensation. After the altercation at his board and care, Jin was moved to a more intensive residential program for a week to stabilize him.

In November 2014, Jin sent a letter to the trial court which contained many of the "common themes" on which Jin had become fixated. Dr. Paglione cited the letter as "a perfect indication" that Jin was "psychiatrically unstable" when he wrote it. In December 2014 Jin's therapist believed he was experiencing auditory hallucinations, which he refused to acknowledge. Jin reported that his eyes were changing from dark brown to blue and gray because he was drinking too much water. He was transferred back to the residential facility where he remained until he received a medication change in March 2015. He has been under intensive supervision since that time.

8

Although Jin had testified that he believed he was punished for crying during therapy by being moved to an intensive level of care, Dr. Paglione explained that weeping is one of Jin's warning signs of psychiatric instability.

Dr. Paglione described several problems she had identified with Jin's discharge plan. Jin had informed his therapist that he planned to stay indefinitely with his brother-in-law until he could find housing. But Jin had no contact information for the brother-in-law, and Jin's brother advised the Gateways treatment team that such a living arrangement would not be an option. Dr. Paglione believed that upon his release from CONREP, Jin would be homeless, he would have no treatment provider or medication, and he would have limited or no financial resources. Dr. Paglione opined that Jin still has a lot to do before he is ready for restoration of sanity, emphasizing that "this is an individual who continues to have symptoms even though he's on medication."

In Dr. Paglione's opinion, Jin currently "poses a degree of dangerousness" and he has not been restored to sanity. According to Dr. Paglione, Jin's recent history demonstrates he remains a "psychiatrically fragile individual" who has been returned to the intensive care residential facility twice in the last year and a half due to psychotic symptoms despite ongoing treatment. He continues to pose a danger to himself and others without the support and structure of the Gateways program, and Dr. Paglione did not believe he would continue to take his medication based on his history. Furthermore, according to Jin's own plan, he would be putting himself back into the exact situation that led to the underlying crime in this case.

Finally, Dr. Paglione disagreed with the conclusions of Drs. Sahgal, Markman, and Goodwin that Jin does not present a danger to himself and others as long as he is medication-compliant. Thus, according to Dr. Paglione, even while on medication, Jin can be dangerous, and may even "have serious symptoms, suicidality, possibly homicidality."

9

**DISCUSSION**

**1.** *Relevant background*

At the end of his cross-examination, the district attorney asked Jin if he was confident about letting the jury decide the issue of restoration of sanity. Jin stated he was. The district attorney then asked, "And you'll be back in another year if they don't [allow you] to be restored?" Before Jin could respond, the court sustained an objection and admonished the jury to disregard the district attorney's statement.

Outside the presence of the jury, the court noted the district attorney's remark was not a question, but a declarative statement. Jin requested an admonition to the jury that the district attorney's remark constituted prosecutorial misconduct, arguing the "question" improperly informed the jury there was little at stake in the proceeding since Jin would have another opportunity to seek restoration of sanity in another year. The court denied the request and expressed confidence that the jury would follow the admonition not to consider the comment.

**2.** *The legal standard for restoration of sanity*

Section 1026.2 provides that a person who has been found not guilty by reason of insanity and committed to a state hospital pursuant to section 1026 may apply to the superior court for release on the ground that sanity has been restored. (§ 1026.2, subd. (a).) Section 1026.2, subdivision (e) establishes a two-step procedure for such an application. Jin's placement in Gateways CONREP in 2009 completed the first step.[4] For the second step, after the applicant has spent at least one year in the outpatient treatment program, the court "shall have a trial to determine if sanity has been restored, which means the applicant is no longer a danger to the health and safety of others, due to mental defect, disease, or disorder." (§ 1026.2, subd. (e).) Both the applicant and the People have a constitutional right to a jury, and the applicant bears the burden of proof by

---

[4] In the first step, if, following a hearing, the court concludes that the applicant is not a danger to others while under supervision and treatment, the court shall order the applicant placed with an appropriate CONREP for one year. (§ 1026.2, subd. (e).)

a preponderance of the evidence. (*In re Franklin* (1972) 7 Cal.3d 126, 148 [interpreting then-section 1026a, predecessor to section 1026.2]; *People v. Coleman* (1978) 86 Cal.App.3d 746; § 1026.2, subd. (k).)

In a restoration of sanity trial, the jury determines not whether the person committed is no longer legally insane, but, as Jin's jury was instructed, whether "in his present medicated condition he is no longer a danger to the health and safety of himself or others," and "he will continue to take the medication as prescribed, in an unsupervised environment." (CALJIC No. 4.15; *In re Franklin*, *supra*, 7 Cal.3d at p. 145; *People v. Williams* (1988) 198 Cal.App.3d 1476, 1480.)

As the trial court observed, there was little actual disagreement among the experts in this case that while on medication Jin does not present a danger to himself or others. Thus, the central question before the jury was whether Jin would remain medication-compliant in an unsupervised setting. On this point, the evidence established that Jin had consistently and voluntarily taken his medications for nine years; he had insight into his mental illness and understood that he would have to take medication for the rest of his life; he had regularly attended AA meetings, he was committed to his sobriety, and he had never tested positive for drugs or alcohol in nine years; and he had plans for his future which included returning to USC or another college to complete his degree, pursuing a career in immigration, and finding companionship in a relationship with a woman. According to Jin, such evidence clearly supported a finding that he would continue to follow his medication regimen in an unsupervised environment, and, but for misconduct by the district attorney, the jury would likely have found him restored to sanity.

### 3. *Prosecutorial misconduct*

The parties do not disagree as to the legal principles applicable to Jin's claim of prosecutorial misconduct.[5] "A prosecutor's conduct violates a defendant's federal

---

[5] As the Attorney General observes, the attorney for the People in a restoration of sanity trial is not technically the "prosecutor." Such trials are civil in nature (*People v.*

11

constitutional rights when it comprises a pattern of conduct so egregious that it infects ' "the trial with unfairness as to make the resulting conviction a denial of due process." ' " (*People v. Bennett* (2009) 45 Cal.4th 577, 594–595.) "Improper comments falling short of this test nevertheless constitute misconduct under state law if they involve use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. [Citation.] To establish misconduct, defendant need not show that the prosecutor acted in bad faith. [Citation.] However, [he] does need to 'show that, "[i]n the context of the whole argument and the instructions" [citation], there was "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." ' (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)" (*People v. Cortez* (2016) 63 Cal.4th 101, 130.)

These principles apply not only to a prosecutor's arguments to the jury, but also to the direct and cross-examination of witnesses. Thus, a prosecutor commits misconduct by intentionally eliciting inadmissible testimony. (*People v. Trinh* (2014) 59 Cal.4th 216, 248; *People v. Chatman* (2006) 38 Cal.4th 344, 379–380 (*Chatman*); see also *People v. Johnson* (1978) 77 Cal.App.3d 866, 873 ["A prosecutor who improperly cross-examines a defendant in order to place inadmissible prejudicial evidence before the jury is guilty of misconduct"].) Further, it is misconduct for a prosecutor to ask a question that implies a fact harmful to the defendant if the question puts before the jury information outside the

_____

*Jones* (1987) 192 Cal.App.3d 400, 403), and the applicant has the burden of proof by a preponderance of the evidence. (§ 1026.2, subd. (k).) Nevertheless, California courts have applied principles of prosecutorial misconduct in the context of civil commitment proceedings in which the People have the burden of proof. (*People v. Shazier* (2014) 60 Cal.4th 109, 144–145 [prosecutorial misconduct in a sexually violent predator trial]; *In re Brian J.* (2007) 150 Cal.App.4th 97, 122–123 [prosecutor committed misconduct in a commitment trial under the Mentally Disordered Offenders Act].) Moreover, the applicant in a restoration to sanity trial is entitled to the full panoply of constitutional rights to due process and a fair trial. (*People v. Otto* (2001) 26 Cal.4th 200, 209; *In re Reyes* (1984) 161 Cal.App.3d 655, 658–659.) Accordingly, we conclude that the attorney for the People in the proceedings below may be held to the standard of conduct applicable to a "prosecutor."

evidence that, but for the improper question, the jury would not otherwise hear. (*People v. Earp* (1999) 20 Cal.4th 826, 859–860; *People v. Visciotti* (1992) 2 Cal.4th 1, 52 ["a prosecutor may not examine a witness solely to imply or insinuate the truth of the facts about which questions are posed"].)

"The permissible scope of cross-examination of a defendant is generally broad. 'When a defendant voluntarily testifies, the district attorney may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them.' " (*Chatman*, *supra*, 38 Cal.4th at p. 382.) As *Chatman* explained, however, the permissible scope of questioning does not include "a speech to the jury masquerading as a question," and "[a]n argumentative question that essentially talks past the witness, and makes an argument to the jury, is improper." (*Id*. at p. 384)

Here, the prosecutor's "question" to Jin about the possibility of renewing his application for restoration of sanity in a year appears intended to, and certainly did, inform the jury that a finding in this case of no restoration to sanity would not be the end of the road for Jin. The prosecution's comment thus gravely interfered with the deliberative process by giving the jury an opportunity to defer its decision to another jury and another day. Given the high likelihood the jury understood *and* improperly applied the information in making its findings in this case, the undermining of the jury's fact-finding function and deliberative process undeniably constituted prosecutorial misconduct. (See *People v. Cortez*, *supra*, 63 Cal.4th at p. 130; *People v. Centeno*, *supra*, 60 Cal.4th at p. 667.)

Even if the prosecutor's actions, taken together, did not comprise a pattern of conduct so egregious that it infected the trial with such unfairness as to result in a denial of due process, reversal is nevertheless warranted if it is reasonably probable the prosecutor's use of deceptive or reprehensible methods to persuade the jury affected the outcome of the trial. (*People v. Shazier*, *supra*, 60 Cal.4th at p. 127; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

13

Jin presented substantial evidence of his restoration to sanity. He tested within normal limits on two psychological risk assessments. He has a proven record of appropriate conduct with no reports of dangerousness while living in an unlocked CONREP board and care facility managed by Gateways. He demonstrates insight into his mental illness, acknowledging it is a lifelong condition which must be controlled with medication. He has consistently and voluntarily taken his medications for nine years, and neither his mother's death nor his brother's relocation to Northern California has caused him to deviate from his medication regimen. He is committed to his sobriety, and he has never tested positive for drugs or alcohol in nine years. He attends AA meetings regularly and has a sponsor, friends and a support community through the organization. Finally, he has plans for his future, which include returning to USC or another college to complete his degree, pursuing a career in immigration, and entering into a relationship with a woman.

By contrast, the People opposed Jin's restoration to sanity on the basis of evidence that had little or nothing to do with the question at hand; that is, whether he would continue to take his medication as prescribed in an unsupervised environment. (CALJIC No. 4.15.) Thus, the district attorney presented expert opinion that a return to USC (where Jin had already completed seven semesters of study) seemed unrealistic, despite the absence of any competent evidence that Jin could not be readmitted. The same expert also opined that Jin's use of the wrong name for the immigration agency for which he wanted to work indicated he lacked a viable post-release plan.[6] The expert concluded that Jin's inevitable failure to reach these unrealistic goals would cause stress, which would increase the likelihood of relapse.

The prosecution also offered the opinion of Dr. Paglione, who herself has never recommended a patient for restoration of sanity and knows of only one patient who has

---

[6] Jin told Dr. Sahgal he hoped eventually to work for the "Department of Immigration" to help immigrants such as himself. But when Dr. Sahgal looked it up, he found no agency exists by that name.

14

received such a recommendation from Gateways. Dr. Paglione cited Jin's letter to the court, his fixation on race, the weather, and the war in the Middle East, the fact that he had cried during therapy sessions, his belief that his eye color was changing, and his act of shaving off his eyebrows and dying his hair as evidence of psychiatric instability, despite no lapse in medication.

In light of the conflicting opinions from qualified mental health professionals, it appears likely that the prosecutor's misconduct had a significant impact on the outcome of this case. To satisfy his burden of proving restoration of sanity by a preponderance of the evidence, Jin presented compelling evidence of the likelihood that he would continue to take his medication in an unsupervised setting, countered by the Gateways representative's opinion that release would be ill-advised. The jury unquestionably faced a difficult decision. But being informed that Jin could reapply for restoration a year after denial gave the jury an out, allowing it to abdicate its responsibility to decide the issue of Jin's restoration to sanity on the facts before it and simply kick the matter down the road for another jury's determination on another day. In these circumstances, we cannot but conclude that the prosecutor's misconduct not only violated Jin's right to a fair trial, but also likely affected the outcome, requiring reversal.

## DISPOSITION

The judgment is reversed, and the matter is remanded for a new restoration of sanity trial. Pursuant to Business and Professions Code section 6086.7, subdivision (a)(2), the Clerk of this court is directed to send a certified copy of this opinion to the State Bar upon issuance of the remittitur in this matter. The Clerk shall also notify the prosecutor, Deputy District Attorney David Berger, that he has been referred to the State Bar. (*Id.*, § 6086.7, subd. (b).)

NOT TO BE PUBLISHED.


LUI, J.

We concur:


CHANEY, Acting P. J.


JOHNSON, J.

16